UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 24-cv-01340-DDD-KAS

CHURCH OF THE ROCK, INC., d/b/a THE ROCK,

 Plaintiff,

v.

THE TOWN OF CASTLE ROCK, COLORADO,

 Defendant.

---

## (AMENDED) RESPONSE TO PLAINTIFF'S
## MOTION FOR PRELIMINARY INJUNCTION

---

## I.      INTRODUCTION

The Church of the Rock believes it should be exempt from the Town of Castle Rock's zoning regulations and the zoning restrictions it proposed for its property. Those regulations (among many other things) forbid people from living in RVs or trailers anywhere in the Town. More than twenty years ago, the Church affirmatively agreed that the zoning uses and regulations served a compelling governmental interest; that they were the least restrictive means possible; and that they did not impose a substantial burden on the Church. Now the Church is backsliding. It no longer wishes to abide by its agreement or obey the zoning code. Instead, it asks this Court to prevent the Town from "interfering" with its decision to "provide[] individuals and small families experiencing homelessness temporary shelter in parked RVs/trailers on the Church's Property." [Doc. 8-34 at 8.]

The Church asserts claims under the Religious Land Use and Institutionalized Persons Act (RLUIPA) and the Establishment Clause, but those claims are not ripe because the Town has taken no final enforcement action and because avenues still remain for the Town to clarify or change its decision. One such avenue is the zoning amendment process that the Church has already initiated. But even if there was a final decision to review here, RLUIPA and the Establishment Clause provide no basis for the unprecedented relief the Church seeks. Moreover, that relief would alter, not preserve, the status quo. The Court should deny the Motion for Preliminary Injunction.

## II.    BACKGROUND

### A.    The Zoning of the Church

When the Church purchased its current 54-acre lot in the late 1990s, it was still located in unincorporated Douglas County. [Doc. 8-4, ¶¶ 32-35.] Before constructing new facilities, the Church sought to have the Property zoned and annexed into the Town of Castle Rock. From 2000 through 2003, the Town and the Church negotiated and drafted development plans under the Town's planned unit development process (otherwise referred to as PD Plans or Zoning Regulations) to accomplish this goal. [Doc. 8-26 at 1 (noting that "[f]or approximately three (3) years, the PD Zoning Regulations were revised five (5) times" with the Church's participation).] PD zoning allows an applicant to tailor various regulations and restrictions, such as uses, to all or part of its property. CRMC 17.34.010 and 17.34.040 (attached hereto as Exhibit A). The parties reached agreement on a Site Plan and Zoning Regulations for the Property, as well as an Annexation and Development Agreement. After a public hearings and comment, the Town Council gave final approval in August 2003. [Doc 8-26 at 1-2; Doc. 8-30.]

All this took place while RLUIPA was the law. Thus, the Annexation and Development Agreement expressly addressed RLUIPA's requirements. Specifically, the Town and the Church agreed:

- "[T]his agreement contains <u>reasonable conditions and requirements</u> … imposed to protect and enhance the public health, safety and welfare of current and future residents of the Town." [Doc. 2-4 at 2.][1]

- The Church "has offered to limit the scale of the church and related facilities," and "acknowledges that this Agreement and the restrictions and limitations on development of the Property under the Development Plan <u>serves a compelling governmental interest</u> and that the provisions hereof are the <u>least restrictive possible to accomplish that compelling governmental interest</u>." [*Id.*]

- The Church "affirmatively states that <u>nothing contained in this Agreement or the Development Plan imposes a substantial burden on [its] exercise of religion</u> or impairs [its] or the members of [its] congregation's ability to worship." [*Id.*; *see id.* at 5 (same affirmation regarding future Town-wide regulations) (all emphasis added).]

As the Church concedes, the Planned Development Zoning District regulations for the Church (PD Regulations) allow specifically enumerated "Church and related uses," none of which include residential use. [Doc. 8-4 at ¶¶ 51-53; Doc. 8-30 at 14-15, §F(1).[2]] The Church also admits, as it must, that the Town's Zoning Code governs any subjects not specifically addressed in the PD Regulations. [Doc. 8-4 at ¶ 53 (citing Doc. 8-30 at § A(4)).]

---

[1] For all unpaginated exhibits such as Doc. 8-4, page citations refer to the PDF page number.

[2] While Doc. 8-30 lists "parsonages" as a permitted use, that term was stricken from the version of the PD Regulations approved by the Town Council, attached hereto as <u>Exhibit B</u>. *See id.* at p. 1, §1(6) (listing amendments). The Church does not claim parsonages as an approved use and does not rely on any such allegations. [*See* Doc. 8-4 at ¶¶ 52; Doc. 8-25 at 6 (Church's counsel asserts, "The Rock is not using the Campers as a parsonage and has never claimed this use.").]

**B.     Castle Rock Does Not Allow Living in RVs or Trailers**

Most relevant here, the Town's Zoning Code prohibits overnight camping and storage of RVs and trailers. Chapter 17.01.010.A of the Castle Rock Municipal Code mandates that "[n]o land shall be used or occupied and no structure shall be designed, erected, altered, used or occupied except in conformity with all regulations established in the [Code]." *See* Ex. A. As no provision of the Zoning Code (nor any other ordinance) permits overnight camping or living in RVs or trailers, the Town has consistently acted to prevent such activity by any landowner, whether religious or secular. *See* Declaration of Tara Vargish ("Vargish Dec."), attached as <u>Exhibit C</u>, at ¶¶ 7-8.

For instance, in September 2020 the Town sent a Notice of Violation to Calvary Church (1100 Caprice Drive in Castle Rock), who was "having people live in the two trailers on [its] property" as part of "a benevolence program … that is designed to provide help for people who have fallen on tough times." Vargish Dec. at ¶¶ 8-9 & Ex. A. After Cavalry's informal request for "a variance" was declined, it voluntarily removed the trailers. *Id*. Similarly, in October 2022, a Notice of Violation was issued to the Castle Rock Autoplex, where the owner was allowing individuals to live in RVs stored at the edge of its lot. *Id*. at ¶ 8 & Ex. B. Again, the issue was resolved when the landowner voluntarily complied with the Town's requests. *Id*. at ¶ 9. All told, the Town has identified more than a dozen instances since 2018 when it informed landowners that RVs or trailers on their property violated the Code's prohibition on storing, camping, or living in such vehicles in Castle Rock. *Id*.

Notably, this prohibition existed in 2003 when the Church affirmed, as discussed above, that nothing about the Code imposes a substantial burden on the Church's exercise of religion or impairs its ability to worship.

The Town's enforcement of its Code is reactive, not proactive, and greatly favors voluntary compliance over formal enforcement through the judicial system. The Zoning Division does not send out inspectors to patrol for unreported code violations; instead, enforcement is based on complaints. When citizens or other agencies report potential zoning violations to the Zoning Division, inspectors investigate. If a violation is found, then a standard Notice of Violation (similar to those in evidence here) is sent to the property owner requesting that the property come into compliance within fifteen days and inviting further contact and discussion with the Town to resolve any issues. If there is no response within fifteen days, another notice is sent. In practice, the Zoning Division does as much as possible, for as long as possible, to collaborate with property owners to bring them into compliance without resorting to formal enforcement action. In the last three years, the Zoning Division has not filed a single enforcement proceeding in municipal court. Vargish Dec. at ¶¶ 4-6.

## C.   The Dispute Over the Church's RV and Trailer

The present dispute began in March 2021, when the Town received a complaint that trailers were parked on the Church's property and "there are people living in the trailers 24/7 and now there is a porta potty set up that they are using."  Vargish Dec. at ¶ 10 and Ex. C, p. 2. Zoning Manager Tammy King emailed Pastor Mike Polhemus asking him to "verify if this is, in fact true?" (March 17, 2021 email, attached hereto as Exhibit D.) Thus began months of additional

complaints, unanswered calls, and general resistance by the Church against compliance with the PD Regulations and the Zoning Code. [Doc. 8-26 at 3; Vargish Dec. at ¶ 11 & Ex. D.]

On November 10, 2021, one of the Town's Zoning Inspectors sent the Church a "Notice of Zoning Violation," noting the presence of the trailers and inviting the Church "to come in, or to call us, so that we might explore possible options to bring the [Property] into compliance with the Code," expressing hope "that it will not be necessary for the Town to Initiate any Code Enforcement action." [Doc. 8-26.]

Some ten months later, On September 26, 2022, the Zoning Manager sent a letter noting that numerous "violations/concerns still exist on the church property and need to be resolved so the property can be in compliance with the Town's Municipal Code." One of these concerns was the continued presence of the RV and trailer. "As previously discussed," Ms. King wrote, "RV's parking on the property for either storage or use to live in, is not an allowed use… The Town understood these RV's to be temporary in nature, however, they have remained on site throughout this year." Again, the letter invited a meeting "to go over these items … so we can work together to get your property into compliance with the Town's codes." [Doc. 8-22; Doc. 8-4 at ¶ 142.]

On November 9, 2022, another letter was sent, this time by an Assistant Town Attorney. Again, the Church was informed that "[t]he use of these RVs for residential purposes as well as the storage of these vehicles on the property are violations of the PD Zoning Regulations." Again, the letter asked the Church to "[p]lease remove the RVs and cease all residential uses on the property." [Doc. 8-23.] Another Notice of Zoning Violation followed the next day, November 10, 2022, repeating the Town's request to "remove storage or residency of campers from the property"

and "to explore possible options to bring the [Church] into compliance with the Code." Vargish Dec. at ¶ 11 & Ex. D.

The Church did not remove the RVs or cease using them as housing. [*See* Doc. 8-4 at ¶ 143 (admitting "the Church took no action" after the September 2022 letter); *id.* at ¶¶ 124-127 (admitting the RV and trailer were frequently occupied between January 2021 and October 2023)[3].] The Town continued to meet with Church representatives to resolve the issue and seek compliance. [*Id.* at ¶ 144.] The Church took the position that use of the RV and trailer for housing was "an accessory use incidental to its principal use of the property [*i.e.*, as a church] and permitted under the PD Zoning Regulations." Vargish Dec. at ¶ 12 & Ex. E. The Town disagreed with this interpretation, and—at the request of the Church—developed and issued a final determination that the Church could appeal to the Board of Adjustment. Vargish Dec. at ¶ 14 & Ex. F ("Town staff will look on [*sic*] taking the issue to the Board of Adjustment as a [*sic*] appeal of an administrative decision. If this is possible, then the Town will send this determination to the church.").

That Letter of Determination was sent to the Church on September 29, 2023. It reiterated that "RV's parked on-site, that serve as a residence are not an allowed use." [Doc. 8-24.] The letter also provided information regarding the Church's right of appeal to the Board of Adjustment. [*Id.*] The Church promptly appealed, and the Board of Adjustment heard the appeal on December 7, 2023. [Doc. 8-4 at ¶¶ 147-148; Doc. 8-25.] The Board of Adjustment affirmed the Zoning Manager's letter of determination. [Doc. 8-4 at ¶ 148 & n.5; Doc. 1 at ¶ 214 & n.6.]

---

[3] These admissions contrast with Pastor Polhemus's representation to the Zoning Manager in April 2023 that the Church had "not used the campers and will not place anyone in them in the future." Vargish Dec. at ¶ 13 & Ex. F (emphasis added).

Decisions of the Board of Adjustment are subject to judicial review. The Church invoked that option, filing a state-court action under Colorado Rule of Civil Procedure 106(a)(4) in Douglas County District Court, but abandoned that effort before ever serving the Town with its complaint. [Doc. 1 at ¶ 214 n.6.]

As the Board explicitly noted during the hearing on the Church's appeal, the Church (like any property owner in Castle Rock) also has the option to seek amendments to its current zoning. The Town's zoning regulations provide a specific process for amending the Church's PD Plan and Zoning Regulations. Vargish Dec. at ¶ 16; s*ee* Ex. A (CRMC 17.36.010, *et seq*.). Vice-Chair Lyons observed that the Church already had a pending preapplication for amendments to its PD Regulations and asked, "is that intended to change the zoning to allow this use?" *See* Hearing Transcript, attached as Exhibit E, at 82:18-19. Counsel for the Church agreed that the Church had already begun the preapplication process and that "there have been some discussions between the Town officials and the Church relating to potential changes. It's unknown at this time where those discussions will lead." *Id* at 82:21-25. Pastor Polhemus likewise agreed that "[i]f we do need to make a change to the zoning, I guess that would be the next step." *Id*. at 83:6-7.[4]

To date, however, the Church has not requested any amendments to its existing zoning that would allow temporary housing in trailers or recreational vehicles. Instead, the Church has proposed another project: a large-scale redevelopment of its 54-acre site to include a new "community worship center" that "would provide a few guest suites to accommodate parishioners or guests for short-term stays" and an unspecified amount of "[a]ttainable housing for seniors, the

---

[4] *Also available at* https://castlerock-co.granicus.com/player/clip/1668, at 2:00:30-2:01:28.

disabled and workforce … in planned, buffered, and integrated buildings."[5] Vargish Dec. at ¶ 17 & Ex. 6, p. 5.

**D.      The Dispute Over Coffee, and the Housing Authority**

The Church asserts that after the Board of Adjustment hearing, "the Town took retaliatory actions to limit the Church's operations and ministries." [Doc. 8-34 at 15.] Specifically, it alleges that "the Town took adverse actions against the Church's coffee service." [*Id.*] The Church's account is misleading. The Town took no action at all regarding the Church's practice of providing free coffee to congregants and other participants in the Church's weekly services. Nor were the Town's actions motivated by, or in any way connected with, the Church's appeal of the letter of determination or subsequent litigation.

Instead, like all its zoning enforcement, the Town's actions addressing the sale of coffee on the Church's Property were spurred by citizen complaints. On March 27, 2024, the Zoning Division received three separate messages from neighbors of the Church; a fourth message was received on April 1. The neighbors reported that a for-profit retail coffeeshop was opening inside the Church, asked whether this was permitted under the Code, and expressed varying levels of concern about safety, traffic, and other issues. Vargish Dec. at ¶ 18 & Ex. H. The Zoning Manager duly investigated and found a March 26 social media post from Lost Coffee, a local business, announcing that it was "super excited to be expanding our business on a completely different side

---

[5] These proposed zoning changes are not at issue here. Nevertheless, any ruling by this Court that could be interpreted to exempt the Church from requirements of the Zoning Code would have significant implications for the public approval process of the Church's much larger proposed development project—and indeed, all future land development proposed by any church or other religious institution or group.

of Castle Rock." [Docs. 8-27, 8-32.] The post gave the address of the Church, but did not mention the Church by name, indicate any association with it, or express any religious character or orientation. [*Id.*]

Lost Coffee's proposed retail expansion violated the Property's PD Zoning Regulations, as retail business is not an approved use under the regulations. Accordingly, on April 2, 2024, the Zoning Manager sent the Town's standard Notice of Violation to the Church (as the property owner) and Lost Coffee (the operator of the retail business). [*Id.*] The notices explained the potential violations and penalties, and again invited further discussion "so that we might explore possible options to bring the [Property] into compliance with the Code." The notices explicitly distinguished between a retail "coffee café open to the public" and "serv[ing] coffee during service times to church members, and NOT in a retail capacity," explaining that the latter would not require a business license or violate the PD Regulations but "a building and fire inspection are still needed" whenever "a new user goes into an existing building." [*Id.*] Later that same day, the Zoning Manager received an email from the owner of Lost Coffee "confirming that we don't operate at Lighthouse at the Rock and we don't intend to do so." Vargish Dec. at ¶ 18 & Ex. I.

The Church also maintains, without supporting evidence, that the Town was responsible for "persuading the Housing Authority to cease cooperating with the Church on a proposed development." [Doc. 8-34 at 36.] But the letter from the executive director of the Douglas County Housing Partnership cited by the Church explains simply that the Church's decision to take legal action against the Town created a potential conflict of interest. The Housing Authority—a quasi-public body which potentially would be responsible for decisions regarding grants or other funding for the Church's proposed affordable housing development (*see supra*, p. 8)—explained that it

could not "maintain [its] required neutrality" if it was partnering with the Church while the Church sued one of the Housing Authority's members. [Doc. 8-28.]  The Town did not exert any influence over the Housing Authority's decision, and the Church has not provided any evidence supporting such allegations.

## III.    ARGUMENT

### A.    The Church Cannot Succeed on the Merits

Before the Board of Adjustment, the Church explicitly recognized "that the use of its Property for its mission and spiritual purposes cannot be used as a justification to avoid the Castle Rock Zoning Code." [Doc. 8-25 at 10.] Now, the Church takes the opposite view, asserting that the Town must be enjoined because its "application of the PD Regulations here prevents the Church from carrying out [its] ministries and fulfilling its religious obligations." [Doc. 8-34 at 42.] The Church disclaimed this very argument twenty-one years ago, and it fails on the merits now.

#### 1.    The Church's claims are not ripe.

A plaintiff has the initial burden of showing its claims are ripe for adjudication. *Signature Props. Int'l, Ltd. P'ship v. City of Edmond*, 310 F.3d 1258, 1265 (10th Cir. 2002). "Ripeness doctrine draws 'both from Article III limitations on judicial power and prudential reasons for refusing to exercise jurisdiction.'" *N. Mill St., LLC v. City of Aspen*, 6 F.4th 1216, 1224 (10th Cir. 2021) (quoting *Utah Republican Party v. Cox*, 892 F.3d 1066, 1092 (10th Cir. 2018)). Ripeness is "peculiarly a question of timing," and is determined as of the date of the Court's decision, not the date the lawsuit was filed. *Buckley v. Valeo*, 424 U.S. 1, 114–118 (1976) (quoting *Regional Rail Reorganization Act Cases*, 419 U.S. 102, 140 (1974)).

In the zoning context, a takings claim is not ripe "until the government entity charged with implementing [zoning] regulations has reached a final decision regarding the application of the regulations to the property at issue." *Williamson Cnty. Reg'l Planning Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172, 186–87 (1985), *overruled in part on other grounds by Knick v. Township of Scott, Penn.*, 588 U.S. 180, 187 (2019) ("Knick does not question the validity of this finality requirement, which is not at issue here."). The Supreme Court more recently reaffirmed that, "[w]hen a plaintiff alleges a taking in violation of the Fifth Amendment, a federal court should not consider the claim before the government has reached a 'final' decision." *Pakdel v. City & Cnty. of S.F.*, 594 U.S. 474, 475 (2021). *See also Ateres Bais Yaakov Acad. of Rockland v. Town of Clarkstown*, 88 F.4th 344, 350 (2d Cir. 2023) (applying ripeness to RLUIPA claim, noting "[g]enerally, suits in the land-use context are not ripe until a landowner receives a final, definitive decision on a land-use application.").

The doctrine of prudential ripeness and its finality requirement are intended "to ensure that the issues and the factual components of the dispute are sufficiently fleshed out to permit meaningful judicial review." *Bateman v. City of W. Bountiful*, 89 F.3d 704, 707 (10th Cir. 1996). "A 'final decision' requires not only an initial rejection of a particular development proposal, but a definitive action by local authorities indicating with some specificity what level of development will be permitted on the property in question." *SK Fin. SA v. La Plata Cnty., Bd. of Cnty. Comm'rs*, 126 F.3d 1272, 1276 (10th Cir. 1997). The finality requirement is only satisfied when "there is no question about how the regulations at issue apply to the particular land in question." *Pakdel*, 594 U.S. at 478.

Accordingly, "a plaintiff's failure to properly pursue administrative procedures may render a claim unripe if avenues still remain for the government to clarify or change its decision." *Id.* at 480; *see Landmark Land Co. of Okla., Inc. v. Buchanan*, 874 F.2d 717, 721 (10th Cir. 1989) (claim not ripe where city had "neither indicated definitively what level of development will be allowed on [plaintiff's] property, nor finally and officially ruled out the possibility that [plaintiff] will be able to proceed with its original plans"), *abrogated in part on other grounds by Fed. Lands Legal Consortium v. United States*, 195 F.3d 1190 (10th Cir. 1999). While ripeness doctrine was developed in the context of Fifth Amendment takings, the Tenth Circuit and other courts have consistently applied ripeness requirements to non-takings claims grounded upon similar facts. *Bateman*, 89 F.3d at 709 (holding due process and equal protection claims unripe); *N. Mill*, 6 F.4th at 1234 (substantive due process, equal protection, and spot-zoning claims); *Rocky Mountain Materials & Asphalt, Inc, v. Bd. of Cnty. Comm'rs*, 972 F.2d 309, 311 (10th Cir. 1992) (procedural due process claim).

Although the Tenth Circuit has not yet spoken on the issue, other Circuits have applied the ripeness requirement specifically to RLUIPA claims. *See Guatay Christian Fellowship v. Cnty. of San Diego*, 670 F.3d 957, 976 (9th Cir. 2011); *Miles Christi Religious Order v. Twp. of Northville*, 629 F.3d 533, 537–38 (6th Cir. 2010); *Murphy v. New Milford Zoning Comm'n*, 402 F.3d 342, 352 (2d Cir. 2005); *see also Congregation Anshei Roosevelt v. Planning & Zoning Bd.*, 338 Fed. App'x 214, 219 (3d Cir. 2009) (affirming dismissal of RLUIPA claim as unripe under *Williamson County*). These courts also apply the doctrine equally to First Amendment free exercise claims. *See, e.g., Guatay*, 670 F.3d at 979; *Murphy*, 402 F.3d at 350 ("[W]e do not believe it necessary to distinguish the RLUIPA claim from the First Amendment Free Exercise claim when it comes to

our ripeness inquiry."); *Ateres Bais Yaakov Acad.*, 88 F.4th at 350 (applying ripeness to RLUIPA and Constitutional claims).

Here, the Church cannot meet its burden to show that its claims are ripe, because it has not yet even asked the Town for a final decision regarding its ability to utilize its trailer and RV for temporary housing. The Town clearly has a process under CRMC 17.36.010, *et. seq.* to amend PD zoning regulations, which would be applicable to the Church's Property. *See* Ex. A; Vargish Dec. at ¶ 16. That process would not end with the Board of Adjustment, but with a vote of the Town Council after public hearing and comment. As noted above, both Pastor Polhemus and Church counsel conceded before the Board that "there have been some discussions between the Town officials and the Church relating to potential changes" and that "a change to the zoning, I guess … would be the next step." Not only has the Church failed to exhaust its ability to request changes to the Property's PD Regulations to allow temporary housing, it has not yet made any such request. The Church is aware of the zoning amendment process, which it has already initiated to develop other portions of the Church property, but there is no mention in that preapplication of any desire to add temporary housing in RVs or trailers as a new approved use. Vargish Dec. at ¶ 17 & Ex. G.

In short, the Church's RLUIPA and First Amendment claims applicable to the motion for preliminary injunctive relief are subject to dismissal as unripe, because "avenues still remain for the government to clarify or change its decision." *N. Mill*, 6 F.4th at 1226 (quoting *Pakdel*, 594 U.S. at 480). Accordingly, the Church is not likely to succeed on the merits of those claims.

### 2.    The Church's claims fail because it cannot show a substantial burden.

Under RLUIPA, a land use regulation cannot "substantially burden" the exercise of religion unless the government shows it is the least restrictive means of furthering a compelling

governmental interest. 42 U.S.C. § 2000cc(a)(1). "Although RLUIPA provides a very broad definition of 'religious exercise,' it fails to define 'substantial burden.'" *Grace United Methodist Church v. City of Cheyenne*, 451 F.3d 643, 661 (10th Cir. 2006) (internal citation, quotation omitted). In the Tenth Circuit, for a regulation to significantly burden religious exercise, it "must significantly inhibit or constrain conduct or expression that manifests some central tenet of an individual's beliefs; must meaningfully curtail an individual's ability to express adherence to his or her faith; or must deny an individual reasonable opportunities to engage in those activities" that make up his or her religious practice. *Id*. (quoting *Thiry v. Carlson*, 78 F.3d 1491, 1495 (10th Cir. 1996)) (cleaned up).

However, "[n]o Tenth Circuit case has explored where this law draws the line between 'mere inconvenience' and 'substantial burden'—at least not in the land-use context." *Roman Cath. Archdiocese of Kansas City in Kansas v. City of Mission Woods*, 337 F. Supp. 3d 1122, 1136 (D. Kan. 2018). In *Mission Woods*, the district court reviewed cases from the Second and Fourth Circuits to "identify two requirements for plaintiffs to establish a substantial burden under § 2000cc(a)(1): (1) a need to expand or relocate; and (2) actions by defendant that inhibited their ability to expand or relocate." *Id*. at 1136. (internal citations omitted) (citing *Westchester Day Sch. v. Vill. of Mamaroneck*, 504 F.3d 338 (2d Cir. 2007) and *Bethel World Outreach Ministries v. Montgomery Cnty. Council*, 706 F.3d 548 (4th Cir. 2013)). For the second requirement, "RLUIPA plaintiffs can show that … the government actor refused to consider reasonable limits on the property's use, or that a plaintiff had a reasonable expectation of building there." *Id*.

As in the ripeness analysis, a crucial factor is whether the government's determination could be changed by appeal or amendment: "in most cases, whether the denial of the application

was absolute is important; if there is a reasonable opportunity for the institution to submit a modified application, the denial does not place substantial pressure on it to change its behavior and thus does not constitute a substantial burden on the free exercise of religion." *Westchester Day Sch.*, 504 F.3d at 349. Similarly, if the plaintiff can pursue its desired activities somewhere in the jurisdiction—even if not at its preferred location—the burden is not likely to be substantial. *Civil Liberties for Urban Believers v. City of Chicago,* 342 F.3d 752, 761 (7th Cir. 2003) ("[A] land-use regulation that imposes a substantial burden on religious exercise is one that necessarily bears direct, primary, and fundamental responsibility for rendering religious exercise—including the use of real property for the purpose thereof within the regulated jurisdiction generally—effectively impracticable.").

In addition, "[s]everal circuits have held that, when a plaintiff has imposed a burden upon itself, the government cannot be liable for a RLUIPA substantial-burden violation." *Second Baptist Church v. City of San Antonio*, No. 5:20-cv-00029-DAE, 2020 WL 6821334, at *8 (W.D. Tex. Feb. 24, 2020) (citing *Andon, LLC v. City of Newport News*, 813 F.3d 510, 515 (4th Cir. 2016) and *Petra Presbyterian Church v. Vill. of Northbrook*, 489 F.3d 846, 851 (7th Cir. 2007)). This self-imposed burden factor "reflects that, when a plaintiff has good reason to know in advance that its proposed usage will be subject to an onerous review process, the burdens of that process are not likely to count as substantial for purposes of 42 U.S.C. § 2000cc(a)(1)." *Cath. Healthcare Int'l, Inc. v. Genoa Charter Twp., Michigan*, 82 F.4th 442, 449 (6th Cir. 2023).

Further, "the Supreme Court has held that generally applicable burdens, neutrally imposed, are not 'substantial.' This reasoning helps to explain why courts confronting free exercise challenges to zoning restrictions rarely find the substantial burden test satisfied even when the

resulting effect is to completely prohibit a religious congregation from building a church on its own land." *Westchester Day Sch.,* 504 F.3d at 350 (citing *Jimmy Swaggart Ministries v. Bd. of Equalization of Cal.*, 493 U.S. 378, 391 (1990)); *see id.* (collecting cases). The Fourth Circuit likewise warned that to equate the denial of a zoning variance with a substantial burden on the plaintiff's religious exercise "effectively would be granting an automatic exemption to religious organizations from generally applicable land use regulations." *Andon,* 813 F.3d at 516 ("[s]uch a holding would usurp the role of local governments in zoning matters when a religious group is seeking a variance, and impermissibly would favor religious uses over secular uses.") (citing *Petra Presbyterian Church*, 489 F.3d at 851); *see Civil Liberties for Urban Believers*, 342 F.3d at 762 (explaining that no "free pass for religious land uses masquerades among the legitimate protections RLUIPA affords to religious exercise").

The Church maintains that courts "routinely" find RLUIPA violations where "land-use regulations … restrict a church's ability to shelter or serve on its property individuals experiencing homelessness." [Doc. 8-34 at 22-23.] But the cases it cites cannot bear this weight. In *First Lutheran Church v. City of St. Paul*, 326 F. Supp. 3d 745 (D. Minn. 2018), the court refused to enjoin twelve of fourteen conditions imposed *post hoc* by the city on the church's housing of the homeless, finding them "mere inconveniences on First Lutheran rather than exerting substantial pressure on First Lutheran to change its religious practices." *Id*. at 762. The court enjoined only two conditions: the placement of a "no trespassing" sign (because the church encouraged trespass on its property) and a 20-person guest limit (because it was undisputed the fire-code capacity was 122). Unlike here, no violation of preexisting, longstanding zoning regulations was at issue in *First Lutheran*. *Id*.

In finding a substantial burden, the court in *St. Timothy's Episcopal Church by & through Diocese of Oregon v. City of Brookings*, No. 1:22-cv-00156-CL, 2024 WL 1303123, at *8 (D. Or. Mar. 27, 2024) relied entirely on an earlier case specifically holding that issuing administrative fines for the continued distribution of food to the homeless created a substantial burden. But in that prior case, *Way v. City of Santa Ana*, No. 823CV00183DOCKES, 2023 WL 4680804 (C.D. Cal. June 8, 2023), the plaintiff church had plausibly alleged "that the City's decision was arbitrary … that [the church] had no alternatives readily available to it… [and that the church] would likely be precluded from using other sites in the City." *Id*. at *5-6. Here, the Church ignores *Way* because it can make nothing approaching such a showing. The same is true for *Harbor Missionary Church Corp. v. City of San Buenaventura*, 642 F. App'x 726, 729 (9th Cir. 2016), where the city's denial of a conditional use permit was a substantial burden because it was undisputed that to continue its ministry, "[i]n addition to selling its current property, the Church would have to raise an estimated $1.4 million to relocate." Likewise, in *City Walk - Urb. Mission Inc. v. Wakulla Cnty. Fla.*, 471 F. Supp. 3d 1268 (N.D. Fla. 2020), the court found a substantial burden only because "Plaintiff cannot establish the Program as a principal or conditional use in any district within the County. Further, the Code does not allow Plaintiff to seek a variance," meaning that the church could not relocate "anywhere in the County."

Here, however, the Church faces no such consequences: it can seek a variance or zoning amendment, or find other temporary housing for the individuals who would otherwise live in its parking lot. *See id*. at 1279 (distinguishing numerous cases "where courts have found that relocation within a county, while inconvenient, does not amount to a substantial burden because the religious institution has the ability to relocate within the county."). The Church does not

contend that the Town's zoning prevents it from establishing short-term housing, such as by leasing an apartment or a residence, elsewhere in the Town.

Moreover, the Church has utilized other means of serving homeless or impoverished families and individuals. The Church has provided over $2.5 million in rental and utility assistance to struggling families. [Doc. 8-4 at ¶ 88; Doc. 1 at ¶¶ 103-104.] The Church has furnished at least one individual in need with a hotel voucher. [Doc. 8-4 at ¶ 94; Doc. 1 at ¶ 115.] It operates a food and clothing bank in the Church. [Doc. 8-4 at ¶¶ 72-80; Doc. 1 at ¶¶ 86-93.] These impressive and admirable accomplishments undercut any suggestion that finding other means of temporary housing would be beyond the Church's ability or resources.

In sum, "a government action or regulation does not rise to the level of a substantial burden on religious exercise if it merely prevents the adherent from either enjoying some benefit that is not otherwise generally available or acting in a way that is not otherwise generally allowed." *Adkins v. Kaspar*, 393 F.3d 559, 570 (5th Cir. 2004). Accordingly, the Church cannot show that it has suffered a substantial burden here, where it is merely subject to a generally applicable zoning ordinance. That ordinance existed before the Church took ownership of its Property, so the Church could have no reasonable expectation that residential use would be allowed. In fact, the Church explicitly and contemporaneously disclaimed any such expectation, along with the idea that those existing regulations were a "substantial burden." Moreover, as outlined above, additional avenues remain for the Church to amend its zoning regulations; other practical means are available to accomplish its ministry to temporarily house the poor and homeless; and any burdens on the

Church are self-imposed.[6] In short, the restrictions on the use of an RV and trailer on the Church property only rise to the level of an incidental burden on the Church's religious exercise, dooming its RLUIPA claim.

### 3.    The Church's Free Exercise claim also fails.

The Church concedes that, under longstanding First Amendment doctrine, "the free exercise clause does not prohibit Congress and local governments from validly regulating religious conduct. Neutral rules of general applicability normally do not raise free exercise concerns even if they incidentally burden a particular religious practice or belief." *Grace United Methodist Church*, 451 F.3d at 649 (citing *Reynolds v. United States,* 98 U.S. 145, 164 (1878) and *Employment Div. v. Smith*, 494 U.S. 872, 879 (1990)) (internal citations omitted). [*See* Doc. 8-34 at 28-29.] The Church attempts to escape this doctrine by claiming that "the Town's PD Regulations are not generally applicable, thus the Court must subject them to strict-scrutiny review." [Doc. 8-34 at 27.][7] This attempt fails, because the Church misapprehends the nature of the "individualized exemption" doctrine.

---

[6] The Church asserts in conclusory fashion that "the Town's PD Regulations have left the Church with no means to 'meet [its] same needs' met by the On-Site Temporary Shelter Ministry and the Red Cross Partnership, let alone material means that are 'quick, reliable, or economically feasible alternatives.'" [Doc. 8-34 at 26 (quoting *Westchester Day Sch.*, 504 F.3d at 352).] But it makes no attempt to support this assertion with facts explaining why amending its zoning or any other options are impractical or unfeasible. As discussed, the facts are to the contrary.

[7] The Church also "preserves its argument that the Supreme Court should partially overrule *Smith*." [Doc. 8-34 at 27, 31 n.7.] But of course, "[t]he Supreme Court warns us that, 'unless we wish anarchy to prevail within the federal judicial system, a precedent of this Court must be followed by the lower federal courts no matter how misguided the judges of those courts may think it to be.'" *United States v. Maloid*, 71 F.4th 795, 808 (10th Cir. 2023), *cert. denied*, 144 S. Ct. 1035 (2024) (quoting *Hutto v. Davis*, 454 U.S. 370, 375 (1982).

"In *Smith,* the Supreme Court noted that 'where the State has in place a system of individual exemptions, it may not refuse to extend that system to cases of religious hardship without compelling reason.' We treat this language as the 'individualized exemption' exception to *Smith*'s rule regarding neutral and generally applicable laws." *Grace United Methodist Church*, 451 F.3d at 649 (cleaned up). The Church seizes on this exception to argue that the "PD Regulations establish specific Planned Development Zoning Regulations separate from the Town's *general* zoning code that apply to the Church alone and govern land uses only on the Church's property," and thus are not generally applicable under *Smith*. The Church offers no authority for this argument, which is flawed on many levels.

First, like the plaintiff in *Civil Liberties for Urban Believers*, the Church "appear[s] to confuse exemption from a particular zoning provision (in the form of Special Use, Map Amendment, or Planned Development approval) with exemption from the procedural *system* by which such approval may be sought." 342 F.3d at 764. The Church cannot establish an "individualized exemption" by pointing to a zoning procedure—the Planned Development zoning approval process—that is open to all and uniformly applied without regard to religion. "In short, no person, nor any nonconforming land use, is exempt from the procedural system in place for Special Use, Map Amendment, or Planned Development approval specifically, or the [City's Zoning Ordinance] generally." *Id*. The fact that the zoning ordinances are (necessarily) applied to specific properties does not render them any less generally applicable.

Second, like the plaintiff in *Grace United Methodist Church*, the Church "seems to be asking [the Court] to adopt a *per se* rule requiring that any land use regulation which permits any secular exception satisfy a strict scrutiny test to survive a free exercise challenge." 451 F.3d at 651.

But in *Grace United*, the Tenth Circuit rejected this notion and instead agreed with the "federal courts [that] have held that land use regulations, *i.e.,* zoning ordinances, are neutral and generally applicable notwithstanding that they may have individualized procedures for obtaining special use permits or variances." *Id*.

Finally, in the specific circumstances here, the Church has not shown that the Town provides any individual exemptions from its zoning ordinances prohibiting the storage and habitation of RVs and trailers within Town boundaries. It cannot, and does not, point to any circumstance, past or present, in which the Town permitted a secular exception that is unavailable to religious institutions. There is no evidence, nor even an allegation, that secular organizations or individuals were allowed to operate temporary housing in RVs or trailers while the Church was forbidden from doing so. This "defeats the argument that [the Town] deployed a system of subjective considerations running afoul of the free exercise clause." *Id*. at 655.

In *Grace United*, the Tenth Circuit emphatically concluded that "[t]he First Amendment simply does not entitle the Church to special treatment so that it may operate a daycare exactly where it pleases while no one else can do the same." *Id*. The same logic controls here. The Free Exercise Clause does not entitle the Church to operate temporary housing for the homeless where and how it pleases. The Church is therefore not likely to succeed on the merits of its First Amendment claim.

### 4.      The Church's retaliation claims are baseless.

The Church is correct that both the First Amendment and RLUIPA forbid retaliation. [Doc. 8-34 at 35, 39.] However, rather than presenting evidence of retaliation, the Church offers only its own *ipse dixit*.

The Church identifies only two specific allegations of retaliation: "harassment of the Church's Lighthouse Coffee operations on the Church's Property, as well as its persuading the Housing Authority to cease cooperating with the Church on a proposed development." [*Id*. at 36.] As discussed above (§II(D)), the underlying facts of these incidents show not retaliation, but routine and predictable consequences of (1) opening a business without the proper approvals, and (2) filing a lawsuit.

The Church proclaims that these actions "could only possibly be 'substantially motivated as a response to' the Church's 'constitutionally protected conduct.'" [Doc. 8-34 at 37 (quoting *Van Deelen v. Johnson*, 497 F.3d 1151, 1155 (10th Cir. 2007).] This is again mere argument unsupported by evidence. The Church asserts that the Lost Coffee incident came "right on the heels of the Church's appeal of the Town's zoning determination." [*Id*.] Not so: the appeal was filed on October 13, 2023, but the Notice of Violation was sent to Lost Coffee on April 2, 2024—more than six months later. [Doc. 8-27.] The Town's actions were motivated by (and came "on the heels of") the Church's decision to launch a for-profit retail coffeeshop open to the general public, were unconnected to the appeal, and had no effect on the Church's ability to serve coffee to its congregation. Likewise, the Church has nothing but speculation undergirding its contention that some unidentified Town official "persuaded" the Housing Authority to stop acting as a consultant for the Church, or even that the Authority, facing a lawsuit filed by the Church against one of its members, required any persuasion.

The Church lacks any evidence of retaliation, because no retaliation took place. It cannot show a likelihood of success on the merits of its retaliation claims.

**B.      The remaining factors for injunctive relief weigh in the Town's favor**

The Church fares no better in its effort to show the Town's actions will cause its members irreparable harm, that the balance of the equities tip in its favor, or that the requested relief is in the public interest. *Mrs. Fields Franchising, LLC v. MFGPC*, 941 F.3d 1221, 1232 (10th Cir. 2019); *accord Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). For purposes of a preliminary injunction, "an injury must be certain, great, actual 'and not theoretical.'" *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003) (quoting *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)).

**1.      There is no threat of irreparable harm.**

Although irreparable harm "does not readily lend itself to definition," "a plaintiff must demonstrate a significant risk that he or she will experience harm that cannot be compensated after the fact by money damages." *Fish v. Kobach*, 840 F.3d 710, 751–52 (10th Cir. 2016) (internal quotation omitted). The Church relies on established Tenth Circuit precedent that, at least in the First Amendment context, "the infringement of a constitutional right [is] enough and require[s] no further showing of irreparable injury." *Free the Nipple-Fort Collins v. City of Fort Collins, Colo.*, 916 F.3d 792, 805 (10th Cir. 2019). But as the Tenth Circuit very recently clarified, this rule presupposes that the plaintiff can show some harm from the alleged violation—and courts may not skip that threshold element. "In other words, if [plaintiff] fails to show that the alleged constitutional violation has caused it, or will cause it, specific harm, then [plaintiff] cannot establish irreparable harm—even if it is unable to recover money damages." *Leachco, Inc. v. Consumer Prod. Safety Comm'n*, --- F.4th ---, 2024 WL 2822147, at *5 (10th Cir. June 4, 2024).

Here, the Church claims it will be harmed because "the Town's application of the PD Regulations here prevents the Church from carrying out these ministries and fulfilling its religious obligations to these needy members of the Town of Castle Rock community," which it characterizes as "a *per se* irreparable harm." [Doc. 8-34 at 41-42.] But the Church has not made, nor can it make, any such showing. Accepting that the Church "must serve the poor and needy of its community, including by offering temporary shelter and other services when needed," as already discussed it has not even attempted to carry out this ministry in any alternative fashion under the existing PD regulations. Those regulations do not prevent the Church from finding other forms of temporary shelter, such as private homes, rental apartments, or commercial hotels. They do not prevent the Church from offering "other services" in its existing facilities, or anywhere else.

In short, the Church's refusal to give "individuals needing temporary shelter" any options other than an RV and a trailer in its parking lot is not harm caused by the Town. [*Id.* at 43-44 (describing how "the Church already has turned away needy individuals").] While the Church may prefer one specific method to accomplish its ministry to house the needy, that preference does not justify the extraordinary remedy of an injunction so long as other options are available. *Cruz v. Bd. of Cnty. Commissioners of Cnty. of Bernalillo*, No. CV 22-604 GJF/KK, 2022 WL 4547938, at *9 (D.N.M. Sept. 29, 2022) ("While Plaintiff's current living arrangements might not be ideal, the Court is left with insufficient evidence to conclude that the next-best (but unspecified) alternatives to the voucher-subsidized housing are irreparably harmful."); *Capstone Eyecare Holdings, LLC v. Butcher*, No. CIV-22-751-J, 2022 WL 18142392, at *2 (W.D. Okla. Nov. 16, 2022) ("While these options may be distasteful to Plaintiffs, they undercut the argument that *irreparable* harm will occur absent an injunction.") (emphasis original).

Any harm to the Church here is self-inflicted by its choice not to pursue other means to accomplish its ministry, and thus cannot support the requested injunction. *Salt Lake Trib. Pub. Co., LLC v. AT & T Corp.*, 320 F.3d 1081, 1106 (10th Cir. 2003) ("We will not consider a self-inflicted harm to be irreparable."); *IME Watchdog, Inc. v. Gelardi*, No. 22-CV-1032 (PKC) (JRC), 2023 WL 6958855, at *10 (E.D.N.Y. Oct. 20, 2023) ("[A party's] hardship should be discounted when that hardship is self-inflicted by the [party's] own illegal activity."); *see Datto v. Univ. of Miami*, No. 18-cv-21053, 2019 WL 13255542, at *10 (S.D. Fla. Nov. 18, 2019) ("Plaintiff's decision to not pursue … other avenues of reaching his goals … is a self-imposed injury, and as such, cannot amount to irreparable harm.") (collecting cases), *report & recommendation adopted,* 2019 WL 13255528 (S.D. Fla. Dec. 30, 2019). For this reason, too, the injunction should be denied.

Further, to the extent the Church seeks to enjoin the Town from unspecified future and unknown retaliatory actions, the Church has not identified any threat of retaliatory behavior by the Town. It fails to show any "certain, great, actual, and not theoretical" need for injunctive relief. *Heideman*, 348 F.3d at 1189. And even if it had, an injunction to follow the law is an inappropriate exercise of the Court's equitable powers. *Keyes v. Sch. Dist. No. 1, Denver, Colo.*, 895 F.2d 659, 668 (10th Cir. 1990) ("generally, injunctions simply requiring the defendant to obey the law are too vague.").

### 2.    Public interest weighs in the Town's favor.

The Tenth Circuit has said, in the context of evaluating a request for injunctive relief, that where the applicant's "claim of the public interest is largely a restatement of their own [] interest, and the [government's] claim of public interest is largely a restatement of its own interest in regulating the conduct in question, the 'public interest' prong of the preliminary injunction inquiry

is nothing more than a restatement of the 'balance of hardships' prong." *Heideman*, 348 F.3d at 1191. The Church agrees that here "the harm-to-the-nonmovant factor and the public-interest factor 'merge.'" [Doc. 8-34 at 45 (quoting *Denver Homeless Out Loud v. Denver*, 32 F.4th 1259, 1278 (10th Cir. 2022) and *Nken v. Holder*, 556 U.S. 418, 435 (2009)).]

For the reasons just explained, the Church cannot establish irreparable hardship. But the Town will be harmed if it cannot respond to the Church's violations of its zoning ordinances. Such a restriction on the enforcement of the law is irreparable. *O Centro Espirita Beneficiente Uniao De Vegetal v. Ashcroft*, 314 F.3d 463, 467 (10th Cir. 2002), *citing Motor Vehicle Bd. v. Orrin W. Fox Co.,* 434 U.S. 1345, 1351 (1977) (Rehnquist, J., in chambers) ("[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury."); *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (same).

Further, in the specific circumstances here, any injunction in favor of the Church will cause harm by sowing confusion and conflict on the ground. While the Church casts its requested injunction narrowly, as applying only to "the Church's operation of its On-Site Temporary Shelter ministry," in practice such boundaries will not hold. The City will be unable to adequately respond to citizen complaints that will unquestionably result if the Church resumes its temporary housing ministry. Other landowners who wish to store or inhabit RVs or trailers on their property will justifiably ask for the same treatment as the Church receives. And—as evidenced by the Church's own arguments here—any attempts by the Town to address other complaints of zoning violations on the Property will be met with accusations of "retaliation" by the Church. Especially in light of the Church's ability to use other methods to achieve its goals, these harms distinctly outweigh any potential harm from permitting the status quo to remain.

**C.**     **The status quo will be altered by the Church's requested injunction**

In addition to the four factors identified in the Church's preliminary-injunction motion, a district court must also consider whether the movant's request falls within one of the "disfavored injunction" categories. Disfavored injunctions include those that will (1) alter the status quo, (2) mandate an affirmative act by the defendant, or (3) afford all the relief that the movant could expect to win at trial. *Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1259 (10th Cir. 2004). A request for disfavored injunctive relief "must be more closely scrutinized to assure that the exigencies of the case support the granting of a remedy that is extraordinary even in the normal course." *O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 975 (10th Cir. 2004). Where a movant requests a disfavored injunction, the movant "must make a strong showing both on the likelihood of success on the merits and on the balance of the harms." *Colo. v. E.P.A.*, 989 F.3d 874, 884 (10th Cir. 2021) (quotation omitted).

In the context of injunctive relief, the status quo is defined as "the last uncontested status between the parties which preceded the controversy until the outcome of the final hearing." *Schrier*, 427 F.3d at 1260. More recently, the Tenth Circuit described that period as "the last peaceable uncontested status existing between the parties before the dispute developed." *Free the Nipple-Fort Collins,* 916 F.3d at 798, n.3 (internal citations omitted). Here, the longstanding status quo is that the PD Regulations are in effect and prevent the Church from using its RV and trailer as temporary housing.

Where measured by the date of suit or by the date preceding the first neighbor complaint, here the status quo was the unchallenged PD Regulations along with the underlying Municipal Code not authorizing the storage of, or living in, RVs or trailers. Prior to the dispute with the

Church that began in March 2021, neither the Church nor anyone else challenged this prohibition. Nor did the Town cease its attempts to enforce these regulations. This represents "the last peaceable uncontested status" between the parties. To the extent the Church had any dispute with the regulations, to which it explicitly agreed in 2003, it should not have waited more than 20 years to seek a total injunction. "[W]hen a plaintiff is complaining of irreparable injury from a long-established state of affairs, a court may naturally ask why, if the injury is so pressing as to warrant preliminary relief, the plaintiff waited so long before bringing a claim." *O Centro*, 389 F.3d at 1017 (McConnell, J. concurring).

Thus, the injunction requested here is disfavored. But the Church has not acknowledged, much less carried, its burden to "make a strong showing" on the merits and the balance of harms. For this reason, too, the Court should refuse to enjoin the Town from enforcing its ordinances.

WHEREFORE, for the above reasons, the Defendants respectfully request this Court deny Plaintiff's request for a preliminary injunction and grant any other appropriate relief.

Respectfully submitted this 14th day of June 2024.

BERG HILL GREENLEAF RUSCITTI LLP

*s/ Geoffrey C. Klingsporn*

_____

Josh A. Marks
Geoffrey C. Klingsporn
1712 Pearl Street
Boulder, CO  80302
Phone:  (303) 402-1600
Fax:  (303) 402-1601
Email:  jam@bhgrlaw.com
        geoff.klingsporn@bhgrlaw.com

*Attorneys for Defendant*
*Town of Castle Rock, Colorado*

**CERTIFICATE OF COMPLIANCE**: The foregoing pleading exceeds the type-volume limitation set forth in Judge Domenico's Practice Standard III(A)(1); on June 14, 2024, the Court granted Defendant's motion for leave to exceed these word limits. [Doc. 36.]

## CERTIFICATE OF SERVICE

I hereby certify that on this 14th day of June 2024,  I electronically filed the foregoing **(AMENDED) RESPONSE TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** with the Clerk of the Court using the CM/ECF system which will send notification to such filing to the following e-mail addresses,

Alexander J. Hill
Troutman Pepper Hamilton Sanders LLP
600 Peachtree Street NE, Suite 3000
Atlanta, GA  30308
alex.hill@troutman.com

David J. Hacker
Ryan N. Gardner
Jeremiah G. Dys
First Liberty Institute
2001 West Plano Parkway, Suite 1600
Plano, TX  75075
dhacker@firstliberty.org
rgardner@firstliberty.org
jdys@firstliberty.org

Kevin M. LeRoy
Misha Tseytlin
Dylan J. DeWitt
Troutman Pepper Hamilton Sanders LLP
227 West Monroe Street, Suite 3900
Chicago, IL  60606
dylan.dewitt@troutman.com
kevin.leroy@troutman.com
misha.tseytlin@troutman.com

Carson A. Cox
Troutman Pepper Hamilton Sanders LLP
1001 Haxall Point, Suite 1500
Richmond, VA  23219
carson.cox@troutman.com

Town of Castle Rock, Colorado
c/o Michael J. Hyman, Town Attorney
100 N. Wilcox Street
Castle Rock, CO  80104
mhyman@crgov.com

*s/ Cheryl Stasiak*

_____

Cheryl Stasiak